**In re Larry Joseph PITTMAN, Debtor.**

**Larry Joseph PITTMAN, Appellant,**

**v.**

**Elizabeth J. MILLER, Appellee.**

No. 95–1668–C B/S.

Bankruptcy No. 95–3556–V–V–7.

United States District Court,
S.D. Indiana,
Indianapolis Division.

June 25, 1996.

Edward B. Hopper, Bamberger & Feibleman, Indianapolis, Indiana, for Plaintiff.

Raja M. Salaymeh, Indianapolis, Indiana, and Mark R. Wenzel, Henderson Daily Withrow & Devoe, Indianapolis, Indiana, for Defendant.

BARKER, Chief Judge.

In this appeal debtor-appellant Larry Pittman challenges the bankruptcy court's finding that a transaction between Pittman and the appellee, Elizabeth Miller, gave rise to a non-dischargeable debt in the amount of $172,023.62. For the reasons set forth below, we affirm.

## I. FACTUAL BACKGROUND.

Pittman and Miller became acquainted through a mutual acquaintance in 1992. Eventually, Pittman became Miller's friend and, though neither a real estate broker nor a certified financial advisor, began advising her concerning some real estate and financial transactions. Two such transactions are implicated in this appeal.

In the first, Miller sold a piece of property located at 52nd Street and Keystone Avenue in Indianapolis, Indiana to the then lessee, Red Dellen.[1] The purchase price was $300,-000, half of which was retained by Miller in cash, while the other half was used to pay off the balance due on Pittman's residence located at 670 Smokey Lane in Carmel, Indiana ("the Smokey Lane property"). F & D Corporation ("F & D"), another corporation owned solely by Miller, then took title to the Smokey Lane property. By all accounts, Pittman's role in this transaction was significant; he knew that Miller was interested in selling, he approached Dellen and discovered that Dellen was interested in buying, he was present during the sale negotiations, he introduced Miller to the law firm that represented her in the transaction and he persuaded Miller to use a portion of the proceeds to purchase the Smokey Lane residence.

In the second transaction, Miller—who was no longer represented by an attorney— agreed to sell all her stock in F & D to Pittman pursuant to a stock purchase agreement Pittman prepared. According to the agreement, Pittman gave Miller a $155,000 promissory note payable in monthly installments over a twenty-year period ("the first promissory note"), as well as a mortgage

---

1. The real estate was actually owned by Miller Enterprises, Inc., the stock of which was owned entirely by Miller.

personally guaranteed by Pittman to secure the loan. The agreement, however, also contained a provision that was heavily weighted in Pittman's favor; Miller was required to release Pittman personally from his promissory note and file a satisfaction of mortgage on or before October 1, 1993, a mere year after the execution of the agreement. In exchange, F & D would assume total responsibility for the then remaining balance on the unpaid, and soon to be unsecured, note.

On September 7, 1993, Pittman recorded a satisfaction of mortgage (dated September 3, 1993) purportedly signed by Miller. Also on September 3, 1993, F & D, through its president (Pittman), gave Miller a promissory note for $150,686.24 ("the second promissory note"). Shortly thereafter, on October 6, 1993, F & D, again through Pittman, executed a quitclaim deed conveying the Smokey Lane residence to Pittman individually. As a result of these conveyances and transactions, Pittman owned the Smokey Lane residence outright after having made only fifteen of the agreed 240 monthly payments; Miller, by contrast, held an unsecured note from a corporation (F & D) that had just conveyed its only asset (the Smokey Lane property) to Pittman.[2]

On May 12, 1995, Pittman filed a bankruptcy petition under Chapter 7. Miller initiated this action on June 14, 1995, alleging that the debt owed her was non-dischargeable under Section 523(a)(2)(A) of the Bankruptcy Code because Pittman forged her signature on the Satisfaction of Mortgage. After conducting a short trial on September 7, 1995, the bankruptcy court found for Miller. This appeal followed.

## II. ANALYSIS.

■ Our standard of review in this case is well-settled. On appeal, the bankruptcy court's findings of fact "shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of witnesses." Bankr.Rule 8013. Questions of law are reviewed de novo. *Meyer v. Rigdon*, 36 F.3d 1375, 1378 (7th Cir.1994).

■ The Bankruptcy Code is designed in part to give insolvent debtors a fresh start. *In the Matter of Marchiando*, 13 F.3d 1111, 1115 (7th Cir.1994). Yet only the "honest but unfortunate debtor" can start anew. *Grogan v. Garner*, 498 U.S. 279, 287, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991). As a result, a Chapter 7 debtor will not be discharged from any debt incurred by "false pretenses, a false representation, or actual fraud...." 11 U.S.C. § 523(a)(2)(A). Generally, § 523(a)(2)(A) "contemplates frauds involving moral turpitude or intentional wrong; fraud implied in law which may exist without imputation of bad faith or immorality, is insufficient." *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1292–93 (5th Cir.1995), *quoting* 3 Collier on Bankruptcy ¶ 523.08[4] (15th ed. 1989). The burden falls on the creditor to prove by a preponderance of the evidence that her claim falls within this dischargeability exception. *Grogan v. Garner*, 498 U.S. 279, 287, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991).

After conducting a one-day trial, in which Miller and Pittman were the chief witnesses, the bankruptcy judge found that the debt owed to Miller was non-dischargeable. In particular, the court found (1) that someone had forged Miller's signature on the Satisfaction of Mortgage, (2) that Pittman was aware of the forgery, (3) that Pittman executed the first promissory note with no intention of repaying it, and (4) that despite his position as a trusted advisor and friend, Pittman did not disclose to Miller that she would lose her security after a year, even though Miller lacked business experience and was not represented by a lawyer.

In this appeal, Pittman initially challenges the bankruptcy court's findings as unsupported by the evidence. In his view, the court's acceptance of "the disjointed testimony of [Miller] over the concise cogent story told by Mr. Pittman" is clearly erroneous. (Appellant's Brief in Support, p. 25).

Yet this case was more than a simple contest of his-word-against-her's. Miller, for example, presented the testimony of a handwriting expert, who concluded that she did not sign the Satisfaction of Mortgage. Be-

---

**2.** Pittman subsequently mortgaged the residence to Astrum Funding Corporation.

cause this expert compared the signature on the document to original exemplars (rather than copies, as used by Pittman's expert), the bankruptcy judge gave his testimony great weight. In addition, the notary who purportedly witnessed and subsequently notarized Miller's signature did not recall having ever seen either Miller or Pittman. Thus, there was evidence independent of Miller's testimony to support the bankruptcy judge's finding.

Nor does the record indicate that the factfinder was obligated to give Pittman's testimony more weight than Miller's. Indeed, the bankruptcy judge found Pittman not to be a credible witness,[3] a finding that we do not lightly impugn. Bankr.Rule 8013. While we concede that Miller was often confused as to the identity of documents, their meaning or their consequences, she unequivocally stated that she did not sign the Satisfaction of Mortgage.

Moreover, if Miller's testimony demonstrated anything, it was her total lack of business acumen, not a faulty memory. Pittman—as trusted advisor and friend—was undoubtedly aware of this lack of sophistication. Thus, because Pittman prepared documents that were heavily weighted in his favor, and he knew that Miller was inexperienced, unrepresented by counsel and trusting of his advise, Miller's testimony further supports the bankruptcy judge's conclusion that Pittman acted fraudulently.

Next, Pittman argues that even if the evidence suggests that the Satisfaction of Mortgage was forged, there is no evidence connecting him to the forged document. We disagree. Indeed, Pittman himself testified that he was present when the Satisfaction of Mortgage was signed, (Transcript, pp. 23, 48), and that he was the person who recorded it. (*Id.* at 30). The bankruptcy court could have reasonably concluded from this evidence that, at the very least, Pittman was aware that Miller did not execute the document, yet recorded it anyway.

█ Pittman also argues that Miller cannot demand equity because she comes to the

court with unclean hands because—as she readily admits—she did not sign the Satisfaction of Mortgage on or before October 1, 1993, as required by the stock purchase agreement. Miller's signature, however, had been forged on September 3, 1993, a month before she was even required to sign the agreement. We cannot ascribe blame to her simply because she was beaten to the punch by the forger.

Finally, Pittman argues that "[t]he axiom of 'No Harm No Foul' applies here" because the stock purchase agreement obligated Miller to release the mortgage. (Appellant's Brief in Reply, p. 5). In other words, even though Miller's signature was forged, she was required to sign the Satisfaction of Mortgage anyway. As a result, there was no injury.

The bankruptcy court, however, found that the forgery of the Satisfaction of Mortgage was just one part of a larger fraudulent scheme to acquire the Smokey Lane property "free and clear of any liens without actually having to repay Mrs. Miller the purchase price." (Opinion, p. 8). In other words, the court below found that in light of the surrounding circumstances, Pittman perpetrated a fraud by presenting to Miller the sale of F & D as a legitimate business opportunity. That Miller's signature was forged only serves to underscore the deceit motivating the transaction, regardless of whether it was the act that actually caused injury. Thus, this argument is unavailing.

Of course, all of this is not to say that a reasonable factfinder could only conclude that Pittman methodically planned to cheat Miller out of compensation for the Smokey Lane residence. It may well be, as argued by Pittman, that he structured the deal the way he did because he thought it would be in Miller's best interests. Nevertheless, because there is sufficient evidence to suggest that Pittman intended to defraud Miller, we cannot say that the bankruptcy court's findings are clearly erroneous.

3. According to the court: "based upon the character and demeanor of Mr. Pittman, along with the inconsistency and implausibility of some of his testimony, this Court concludes that Mr. Pittman is not a credible witness." (Opinion, p. 6).

## III. CONCLUSION.

Accordingly, for the reasons set forth above, the bankruptcy court's November 29, 1995 Order is AFFIRMED.

· It is so ORDERED.